is 151504 TriReme Medical v. AngioScore. I know you need no rush. We know you need to set up here. Mr. Cain? Yes, may it please the Court, David Cain for the Appellant TriReme Medical. And I believe I reserve three minutes for rebuttal. The District Court erred in its interpretation of a May 1, 2003, consulting agreement between Dr. Chaim Lotan and AngioScore. It was the District Court's erroneous contract interpretation that led the Court to conclude that Dr. Lotan had assigned his inventorship rights to AngioScore. Do you agree that he should have listed this stuff under 9A? No, Your Honor. Because? Because 9A, the language of 9A said that Dr. Lotan was required or the consultant was obligated to list all inventions, original works of authorship, developments and improvements, and trade secrets which were made by the consultant prior to the date of this agreement. And the Preston case confirms that the ordinary meaning of the word made is physically constructed. And what the record reflects is that Dr. Lotan, prior to May 1, 2003, hadn't made anything. He had come up with a solution to a problem with a prototype that he had tested, and he communicated that solution to the other co-inventors, Dr. Constantino and Mr. Feld. And subsequent to that, Mr. Feld and others worked on, took that concept, took that solution that Dr. Lotan had provided, and they were the ones who were involved in reducing that to practice and creating a new embodiment including that solution. So Dr. Lotan hadn't made anything prior to May 1. Okay, suppose we reject that argument. Okay. Where are we? Well, even if – so then we have to look back. Then if we reject that argument, he had to list it, right? I understand. I understand the hypothetical. No, but do you agree that if we reject your argument about made, he was obligated to list – I understand the question, no. – in the space provided, right? Well, then the question becomes what is an improvement, what is a development? Does it constitute any of those – does coming up with – Okay, let me just – because our time is limited. Sure. What if we think that what happened in August – I'm sorry, April comes within 9A and he should have listed it and he did not? Okay. What, in your view, are the consequences of that? Okay. If that's the case, the only consequence – well, then we have to go to the next sentence, right? There's two sentences in paragraph 9A. The first sentence has this requirement for listing prior inventions and says if the consultant doesn't list, then he represents that there are no prior inventions. But beyond that, there are no – there is no consequence. There's nothing stated in terms of a forfeiture of rights or an automatic assignment that results in – What do you think Andrius Gore would have said? Would they have said okay? Well, it's hard to say because, in fact, the people who were involved in Andrius Gore were aware of this, and yet they dated the agreement May 1st. Wouldn't you think that Andrius Gore would have his hair on fire and say what is going on here? This guy, Dr. Lotan, is trying to hold back work that he's been doing for us and is declaring it as his own work, and he has his own rights to it, and the best we're going to get is a royalty-free, non-exclusive license. As a rational person, don't you think that's how Andrius Gore would have reacted? Well, I mean it's hard to speculate. You don't know? Well, the reason I'm hesitating is only because there weren't a lot – it is bizarre. I grant you that. It is bizarre to sort of have this situation where everybody knows what was going on. The people who were on the other side of the contract, on the Andrius Gore side of the contract, knew that Dr. Lotan was involved and knew what he was doing in April of 2003. So I think I understand the gist of the question, but the reason I hesitate is I don't know why they didn't simply say, well, let's make the agreement April 1st. Let's make the agreement March 1st. So maybe they weren't concerned. Maybe covering the intellectual property rights at that time wasn't a big deal to them and their hair wasn't on fire. I don't think – Do you agree that the failure to list wouldn't deprive them of the right to the license? If you assume that he had an obligation to list, then the question is did he incorporate? No, but answer my question. I'm trumped. If he failed to list something, he should have. They'd still get the license, right? So the argument is the language of that second sentence says – Now, what's the answer? The answer is – Do they get the license or they don't get the license? At most. But the answer is I don't think that they do because the language of that second sentence says that the consultant has to incorporate that prior invention into a company invention, product, or process. Dr. Lotan didn't do that either, but – That's a different question. Let's assume that he should have listed it, but he didn't list it, and it was incorporated. They get a license, right? Well, the language is he incorporates it. I don't know why you're taking that decision. Oh, boy. That makes no sense at all. Well, if – That's ridiculous. They can leave it out and they don't get a license when he should have put it in? That doesn't make any sense, does it? Well, I take – I interpret incorporate to mean he has to actually put it in. But if we give it a different – if you don't accept that argument, then the answer is yes. What they would get is a non-exclusive license under 9A, not assignment. Did he breach the contract by not listing it? Angioscore hasn't made that allegation. He had an obligation, though, right? And then he didn't meet that obligation. That's also a right. Can you say right? That he – well, what I can say is that there is some ambiguity in the record as to what he was representing. Did he have an obligation to list his prior inventions? Yes. The paragraph says that he does. The answer is yes. Yeah. Okay. Did he meet that obligation? Again, it depends on how you define – I know he got made and all these other things. Yeah, it depends on how you define prior invention. But if we make all of the – if we make the assumption that it was a prior invention, which I'm not conceding, then yes, he had an obligation to list it as a prior invention. It seems to me the question is if he fails to list something that he should have, is the consequence of that that there's a license or an assignment? That's the issue. And the consequence under 9A very clearly, again, assuming everything we've talked about, incorporate, made, et cetera, the consequence is a non-exclusive license, leaving Dr. Lotan free to make an assignment – I'm sorry, to grant another license because he's still the owner of his inventive rights. Well, I guess the counterargument would be that if he'd listed this, maybe they wouldn't have gone forward with the contract because they would have said, we can't settle for a non-exclusive license to this, which is something that's incorporated into our invention that's this significant. Maybe they would have – I can't say that. They signed this agreement. If you look at the – I guess your argument is they knew what was going on. They knew what was going on. They had this agreement dated May 1st. I believe Androscor signed it. The Androscor representative, who was one of just a handful of people, signed it in October of 2003. Dr. Lotan signed it in November of 2003, so we're talking about five to six months later. This agreement clearly was not a priority. The agreement is not well drafted, and it simply doesn't cover what Dr. Lotan did in April of 2003. What's your position on why May 1, 2003 was picked as the date? There is absolutely no evidence in the record. I mean, I could speculate, but if I were, I don't know. I have no idea why they did that. When did Dr. Lotan really start doing work, consulting work for Androscor? Do you know that? Well, so this was a small group of people, and according to Dr. Lotan's testimony  they started talking about the idea of this angioplasty balloon generally in late 2002. And the first provisional application was filed in January of 2003. They were talking about doing testing, and I believe had a first-generation prototype in March of 2003. And then the animal study, as we know from the record, occurred on April 14 of 2003. Can I—let me go back to what we were talking about before. Let's assume—because, I mean, we can talk about that, leaving aside what people might have known and so forth. If we're just looking at the contract, it seems to me—don't argue with me. If we assume 9A has been violated, and you assume this is something that he should have listed and he did not list, then the question becomes, what are the consequences? Are the consequences simply a 9A non-exclusive license, or are the consequences reaching to 9B? Why is it not fair to construe 9A and 9B together? And if—and I think Judge Dyke started to talk about this, which is there are consequences. If you have not done what you were obligated to do in 9A and have not listed an invention that should have been listed, then that can feed into what they're trying to do in 9B. If they really didn't know about it, then it could affect what they're letting him work on that they otherwise wouldn't have, etc. So aren't there circumstances where, in fact, the failure to list could feed into the remedy in 9B for assignment? Well, I don't think so, Your Honor. I don't think there's any support for that in the language of the contract. And, of course, the contract is essentially a form contract that doesn't take into account any of the circumstances of what went on here, which is somewhat— What do you mean it's a form contract? Well, I mean it's not written to the extent of the record that we have. It didn't come out of a form book, right? I'm sure it didn't come out of a form book, but I'm sure it came off an attorney's computer, not tailored to these particular— I'm sure the record shows that. Speculated, Your Honor. I don't have any evidence one way or the other, but I don't believe there is any testimony that this contract was specifically written and tailored for this particular circumstance for one consultant. But who cares? I mean the party signed a contract that applied—you're not arguing that this contract doesn't apply to these circumstances. I'm not arguing that. What I'm arguing is that there's nothing in 9b that says that in the event that a consultant does not list a prior invention, it becomes assigned or somehow occurs during the term of the agreement. The language of 9b is very clear that the only assignment obligations comes with respect to conception, reduction to practice, or development occurring during the term of the agreement. Yeah, but the problem is this, that if he complied with his obligation to list it, they might have said, well, May 1st is the wrong date for this agreement. We've got to move it back to April 1st so that this is encompassed within 9b. And that would be the argument, that they wouldn't have been satisfied with a non-exclusive license under 9a, but that they would have insisted on redrafting the agreement to bring this within 9b. Well, if that's the case, then that would sound like they have—they would have a contract remedy, or perhaps that's what they should pursue if they believe that there was some listing that should have occurred that it didn't. But that doesn't deprive—that can't deprive Dr. Lotan of his inventorship rights. I mean, absent some express language that says, if you don't—and we see this in some agreements in IMATEC and in Preston where they spell out, if you don't list, then you don't—then something becomes assigned based on this particular language of those agreements. That's not the language here. The language here in 9b doesn't have any tieback that says— His ownership rights. Yes, his ownership rights in his own inventions. Yes, that's right. Okay, we're into rebuttal. Let me save you rebuttal time here from the other side. Thank you. Please, the Court. Peter Arminio for the Appellee Angioscore. I'd like to pick up with the Court's questions, what would Angioscore have done if Dr. Lotan had properly listed? They would have either, as Judge Chen suggested, changed the date of the contract, changed the effective language for 9b. They could have changed the product and decided, well, we don't have full rights to what Dr. Lotan is disclosing and reserving, so we're going to take our product, which was in a fluid design and development stage, in a bit of a different direction so as not to use his rights that he's reserving. Well, isn't it clear? I mean, your friend, I think, suggested or talked as if everybody knew what was going on here. Everybody was working together and everybody knew what was going on in April. So how can you come here and tell us that there should be consequences because they would have acted differently if, indeed, they knew about it anyway? Sure. And, Your Honor, you're exactly correct. This was a small medical startup company. They were all working on one thing, the Angiosculpt product. There wasn't a big company with lots of different products. But what Dr. Lotan did is when he signed the contract with Exhibit C blank and he signed Exhibit C, he was the one who drafted Exhibit C. He could have written anything he wanted to say, I reserve rights in the following things. So he was the drafter of Exhibit C, not Angioscorp. He left it blank. And Section 9a of the contract tells us the exact effect of that. It says, if no such list is attached, consultant represents that there are no such prior inventions. So that was Dr. Lotan telling his colleagues at Angioscorp, I'm not claiming that anything I did before May 1 is my property either solely or jointly. I'm giving you, my colleagues, assurance that I'm not claiming. What his testimony was, I didn't list it because basically I misread the contract and didn't think it was an invention. And suppose he said at the time, I did this work before May 1. I'm not listing it in the attachment because I don't consider this to be an invention. And nobody had said anything. Where would we be then? I think we would be in a place where there is a binding representation that 9a provides if the list is blank. That is, the contract says exactly how a blank list is to be interpreted. And it's interpreted as a representation that there are no prior inventions. But that doesn't say that there's an assignment of anything that's not listed either. Well, the representation would be a binding one, as we know, both by contract and by the California Evidentiary Code. So he's telling his colleagues, I didn't do anything before the operative date, May 1, 2003. And then we know he did work on the Angioscorp project and Angioscorp product after. That's admitted. Counsel has written in their brief that he shepherded the design through clinical trials for FDA approval. So he did work on it. So that triggers the 9b assignment. But this is not a 9b case in front of us right now. This is a 9a case. I didn't see the district court relying on 9b as having been triggered to the point where all invention rights automatically flowed to Angioscorp. So sticking with 9a, the problem with the reading of 9a that you are needing to defend is that if Dr. Lotan had in fact invented something five years before ever talking to Angioscorp, but had not listed that invention on Exhibit C, then this reading of 9a mandates that that invention that Angioscorp never had anything to do with is now those rights are transferred to Angioscorp. And that seems really extreme. What do you have to say? Two parts. First, and I'll save it for the second part, the district court did find a 9b transfer as well. But to address your question, Judge Chen, on 9a, if he had this prior invention and he failed to disclose it, but then again, that's a representation by him that he didn't have any rights. You couldn't possibly argue that if he invented something five years earlier that it got assigned to him, right? I mean, that's not... The question is really, to my mind... That's as bad as the argument that there's no license. The argument I'm trying to articulate is, and perhaps not well, I apologize, really what we look at is did Dr. Lotan have anything to give to Trirene in 2014? Take Judge Chen's hypothetical. He invented something totally different here, but that nonetheless came within the language of the contract five years earlier. That wouldn't be assigned, right? How could you read this as suggesting that 9a would assign that? I'm not suggesting that, Judge Sykes, because what we have is language we haven't yet focused on in 9a, that these inventions prior, right, have to relate to any of the company's current or proposed businesses, products, or research and development. So it's basically saying, we're bringing you on, Dr. Lotan, to work with us. Do you have rights that you believe are yours, solely or jointly, to what we're working on? And he represented, by leaving Exhibit C blank, he had no such rights. He should be held to that representation. The district court found that. So number one, in the question, did Dr. Lotan have anything to license to Trirene in 2014? Well, no, because he represented that he didn't have anything prior. I'm getting more confused rather than less confused. Can I go back to Judge Chen's hypothetical? If he had invented something five years earlier, and it's a widget, and what the contract doesn't say, you don't get a non-exclusive license just to all of his inventions, right? The contract is more limited than that. 9A says, if then he incorporates this widget that he invented five years ago into the product of the company, then, yeah, they get a non-exclusive license for that. Is it your view that that's the way it ought to go? So the answer to Judge Chen's question is, if he invented something five years ago, and then he is responsible for putting it in to the company's product while he's working with them, the company gets a non-exclusive license to that. Is that your construction of 9A? That's how 9A would work. But if Dr. Lotan didn't list it, the district court's reading would be that, oh, well, then Angioscor, Dr. Lotan has effectively assigned, not merely licensed, but assigned that earlier patent from five years ago to Angioscor. I don't believe that's how the district court looked at it. I believe what the district court did is, as Chief Judge Proh suggested, she read 9B and 9A together. 9B is, if you're working on an invention solely or jointly during your time with us after May 1, 2003, you're assigning to us all of your rights in that. And the undisputed evidence of record is that Dr. Lotan did work on the invention after May 1, 2003 through his clinical studies and the like. What 9A was, as the district court held, was a carve-out to 9B to say, okay, if you happen to work on some intellectual property during your time with us after May 1, 2003, but you had previously, this is previous work of yours, then you can carve out and merely grant us a license as opposed to the assignment effect of 9B. So we still have what I'll call a lacuna, which is pre-May 1 work that maybe hasn't been listed in the Exhibit C, but 9A is what applies. We're in 9A land, not 9B land, because we're talking about pre-May 1 work. Why is there anything in these two paragraphs that commands that all of those unlisted inventions get assigned to Angioscorps? That's the problem. You have an argument with respect to something which was done at the time, and they would have had an earlier date for the agreement if they'd known about it, and that fits in with the facts of this case. But under Judge Chin's hypothetical, we're talking about something that happened earlier, and they couldn't predate the agreement to cover that thing. So it seems as though in that circumstance, the five-year earlier invention, it's very difficult to read this as saying that that should be treated as assigned. If it were a five-year earlier invention for which there was no ability to invoke 9B because the consultant didn't work on it during the actual term, then there's not going to be any kind of assignment. We get the assignment out of 9B for things that were worked on during the term, and it was undisputed that Dr. Lotin worked on this during the term. He worked on the one product they had, the Angioscorp product, that's the subject of all these patents. So 9B applies, and then we looked at 9A to see was there a carve-out. Did he hold something back? And this court has looked at a number of cases with carve-outs and tried to determine whether those apply. But here, the carve-out was fine. Is it wrong for me to look at 9A as being about everything that happens up to May 1, 2003, and then 9B being about everything that happens after May 1, 2003? It's not wrong to look at it structurally that way, but what happens is 9B has a reach-back effect. If you work on something, an invention, while you're at the company, if you work on it, develop it, improve it, move it forward. If you work on it, you're assigning things, including things you brought to the consulting agreement that you may have done before, unless you wrote those things down on 9A. But why does it matter if you wrote them down or not? It matters because he is saying and only carving out from 9B's assignment provision those things that are written down. So by writing nothing down, he is carving nothing out of 9B. So anything he worked on, any invention he worked on, solely or jointly, gets assigned to Angioscore. And there's no dispute that he jointly worked on the one product they had at Angioscore, the Angioscope, with the named co-inventors, the people who actually got on all of the patents. He jointly worked on it. Council even said others reduced it to practice. As I understand your position, if Dr. Lotan had invented something and owned the patent to an invention from five years prior with no relationship to Angioscore, but somehow that invention, thanks to him, got incorporated into Angioscore's catheter, is it your position that that invention, that patent, Dr. Lotan's patent from five years prior, has now been assigned to Angioscore? If we had fully developed, issued patent IP, I think what there would be was a non-exclusive license under 9A. If he listed it and if he didn't list it, perhaps there would have to be an action to correct the listing, or the list would be deemed to include it to have an exclusive license. But what we have here— Okay, so your position is, under my hypothetical, Angioscore doesn't get an automatic assignment of Dr. Lotan's patent. If it was fully formed IP that Dr. Lotan wasn't working on during the term with his colleagues, I think that's a scenario in which they wouldn't get an assignment. But somehow, under the actual facts of this case, where there was inventive work before May 1, but then it flows into additional development work after May 1, somehow all of those natural inventor rights that get developed in April automatically get assigned to Angioscore? They do, because he, with his colleagues— Whatever work he did after May 1 doesn't rise to the level of triggering the assignment provision in 9B. Let's just assume for the moment that whatever he did post-May 1 can't be deemed to be conceiving or developing or reducing to practice the invention. If he didn't do anything to trigger 9B, you would not need to look at the carve-out of 9A. I agree with that as a fundamental proposition. I have to. That's the way the contract is written. But he did work on the invention, and counsel even admitted in this argument. It wasn't reduced to practice until after the assignment provision took effect, May 1, 2003. He worked on developing it. He worked on clinical trials for it. He worked on all of the things that made it be able to get FDA approval down the road, because this is a medical device. Because then your argument sounds like it's just a straight-up 9B argument, that his work post-May 1 triggered paragraph 9B, and so you don't have to worry about 9A. It is a 9B argument. We prevail on 9B. But 9B, I have to be careful, right, because 9B has a carve-out in 9A. If something had been listed, then that could have prevented assignment under 9B, but there was nothing listed, so there was no carve-out. And a little more – Can you show me where in the district court's opinion the district court said, I find that all the sum and substance of Dr. Lotan's work after May 1 amounts to either developing, conceiving, or reducing to practice this invention, and therefore, by the terms of paragraph 9B, Dr. Lotan has assigned this invention to angioscore. I didn't see that. What I saw instead was the district court observing that some of those post-May 1 activities, quote-unquote, might have risen to the level of being a development or reduction to practice. But then I didn't see the judge go any further than that. I'm trying to get you the best sight for this. So if we look at 8A, so it's page 7 of the district court's decision, the district court recounts that there's no dispute the catheter was an angioscore product, and then lists and writes out the words of section 9B, and then the district court goes into the carve-out that might pertain, and then going on to page A9, which is page 8 of the decision, the district judge says, well, there wasn't any carve-out because there's nothing listed on exhibit C. So it says the court says from these undisputed points, Dr. Lotan assigned whatever rights he had in the balloon catheter in 2003, retained nothing through the exclusion mechanism of 9A. Okay, so to me, that's why I looked at the judge's reasoning as being all about paragraph 9A. And then if you go to 815, lines 4 to 8, you'll see under the plain meaning of section 9B's terms, the judge says this work, Dr. Lotan's work, might have amounted to, among other things, developing, improving, or reducing to practice. And let me just continue that. If you go down to 9 and 10, it says, Tri-Ring says it was only collecting regulatory data, and she says that that may be true, but does not change the outcome. So she's saying even assuming that his only work under 9B amounted to collecting regulatory data on a finished device still would have been an assignment. How could that be? Right. Isn't it because the judge relied purely on 9A as operating to assign this invention to Andrew Score somehow? The judge in 814 and 815 reviewed all of the work that he did after May 1. I think if we look at it, the judge recounts the plain meaning, and the words are there on the page, Chief Judge Pross, as you point out, might have amounted to, and that would be enough under 9B. Has there been full discovery on the question of what he did after May 1? He was deposed, and he had document production. So discovery of him was performed. That was something that— But of other people? Only of Dr. Lotan was deposed, and his documents were produced. And the first phase was focused on the contract. So it doesn't seem to me that the record here really permits a determination as to whether this comes within 9B or not. Actually, it does because we know through his deposition testimony that he worked on the clinical trials. He was talking with his co-inventors, the people who were actually listed on the patent and whom he claims co-inventor status with. They reduced the device to practice during the May 1, 2003 period forward. So the record lets us see that 9B applies, and even in the brief that counsel submitted, they said and admitted he, Dr. Lotan, did the clinical trials that shepherded the device. Can I ask you a question? If it were stipulated, if everybody agreed that the only thing he did under this consulting agreement was collect regulatory data on a finished device, would that come under 9B? Yes, because he helped develop the product. He helped develop it. It's a medical device we're talking about. But if everything he did after May 1, 2003, the only thing he did was collect regulatory data on a finished device, that would come under 9B? It would because it's not a finished device. I mean, it can't be a finished medical device until we know it works. The whole reason that the study in April was so important is they thought they had a device then that worked. They put it in the pig as the pig study, and they found it fell off. It didn't work. So his testing, the clinical trial work, is necessary to develop a medical device, absolutely necessary. It's critical. It's not just an oh, by the way. It's a critical part of the development process for a medical device. If he had learned that there was tearing of the vessel wall, that there were retraction problems, it would have triggered a whole other phase in the development work. It turned out that it worked nicely, to use his words from the testimony, but that doesn't make it any less a part and a crucial part of the development of a medical device for which he was subject to 9B. Let me bring it back just for one moment to 9A. It seems to me that the question here is there's been a breach of the agreement by failing to list his prior invention in the attachment the way he was supposed to. The consequences of that breach have to be remedied, and the question is if it's a five-year-old invention, the consequences of the breach to put the non-breaching party in the position it should be in are to give it a license. The argument is that the consequences of the breach with respect to something which was done as part of the development of this product are that the agreement should be treated as having an earlier effective date. Is that a possible way of looking at this? It is, and a third way to look at it is a possible consequence of the breach is hold him to his representation, which the contract itself provides as the effect of having a blank Exhibit C. If Exhibit C is blank— But you've agreed that the consequence with respect to a five-year-old invention is not an assignment but a license. So it seems to me that the consequences of the breach vary from situation to situation. Certainly we'd have to look at situation to situation, but here in this situation where you've got everybody focused on one thing, this isn't five-year-old separate independent work. This is work together with Angia Score. They write the contract. He says everything up to May 1, 2003, I'm not claiming any rights in any of it as a sole or joint developer, not claiming anything. And then going forward, he works on the project with everybody else, and he puts his IP into the assignment kit, into the pot with everybody else who's working at Angia Score. It shouldn't be allowed that he can skinny his way through all this, fail to disclose his contention that he owns something from prior to May 1, then keep working on it, making sure that the device with that particular feature on it makes its way through the development. But maybe the answer is what Judge Dyke is suggesting is that it's a breach of contract remedy, not a patent law remedy. But if he breached his contract, we have to remember the one thing. It's not Dr. Lotan who's suing for correction. It's Trireme. So really the question is did Dr. Lotan have anything to give Trireme in 2014? And I would respectfully submit the answer is no. No because 9B applies. No also under 9A because he said and he should be held to his representation that he hadn't done anything. But even if we want to say he did and he should have listed it and he breached his contract, the effect should be the same. He did not have anything that he could legitimately hand over to Trireme in 2014 so that they could turn around and sue Angia Score and try to get rights that way through Dr. Lotan's— Do you know why Angia Score chose May 1, 2003 as the effective date of this agreement? There's no evidence in the record of that. And some of the—the case here is very strange because the person who negotiated the agreement— I mean sometimes these employment assignment agreements don't work out perfectly and Stanford v. Roche is an example of that. Very true. The situation here is very strange. Dr. Constantino who was the person who involved Dr. Lotan, he went and found it in Trireme. So—God bless you. So he went on the other side of things. So it's not like we could reach out to Dr. Constantino and say, well, why was it May 1, 2003? He's on the other side. He was in a pretty vigorous breach of fiduciary duty litigation that he lost. It turns out this whole thing came up because during that litigation he went and tried to buy this license from Dr. Lotan for a certain amount of money and then argued license back against Angia Score. So the lack of evidence about why particularly May 1, 2003 is compounded by the fact, right, that one of the co-inventors, Dr. Constantino, switched sides during all of this. So I don't have any hard evidence to say why exactly May 1, but what I can say, and the district court said it, and California law allows to look at the extrinsic evidence of the context. They were all working on one thing at a small startup. Dr. Lotan was brought in to help work on that one thing. The contract date was May 1. They said, do you claim any rights up to May 1? He said no. And the contract was very clear that if you leave that exhibit seat blank, it's a representation. You have no rights. And then going forward, did he work on the project? Absolutely. There was no other project to work on at Angia Score. All they did was the Angia Scope, and his work was critical. His work was absolutely critical. OK. Thank you. Thank you, Your Honor. Your Honor, if I may point you to a piece of evidence in the record. A601 is an email from Dr. Constantino to A601. Yes, Your Honor. OK. OK. This is an email from Dr. Constantino on May 14, 2003, the date of the animal study. It's sent to Mr. Tsori, one of the named inventors on the patents in suit. Mr. Heller, who is the person who signed the May 2003 consulting agreement on behalf of Angia Score, the CEO of Angia Score at the time. Mr. Gershoni, one of the other founders of Angia Score. And CCT Feld, that's Tanchum Feld, the fifth member of Angia Score. So here you have an email that includes all five members of Angia Score at the time, sent on the day of Dr. Lotan's experiment, and it says, subject animal trial today. Dear all, we had a good experiment today with Chaim and David. That's Dr. Mierken, who wrote the report and was Dr. Lotan's assistant. We spent all day there until late evening discussing engineering aspects of the device. Is it absolutely 1,000% clear that the we includes Dr. Lotan? That the we includes the inventor here? Dr. Lotan? Yeah. Yes, it is, because we have that in Dr. Lotan's testimony saying he was doing the animal study and at the meeting following it. If that's Your Honor's question, maybe I'm not answering the right thing. So in other words, this is not a case where Dr. Lotan was pulling the wool over somebody's eyes. Everyone was aware. Everyone was aware of what Dr. Lotan did, when Dr. Lotan did it, at the same day that he did it. And I do agree with counsel that there's nothing in the record that says why May 1st was chosen, but I would respectfully submit that's irrelevant because the contract says what it says. The contract says the effective day is May 1st. Everyone had full awareness of what was done, when it was done, at the time it was done. They wrote the agreement later in October, or at least it was signed in October and November of 2003. The fact that they didn't put the effective date as April 1st or March 1st or what have you should not—shouldn't reflect any more poorly on Dr. Lotan than on Angioscorp. Both were parties to the agreement, and in any event, it doesn't affect an assignment, whether he had to list or didn't have to list under 9A. The only consequence under 9A is a license. When did Dr. Constantino start working on what eventually became Trireme? Was it 2003? So Trireme was founded, I believe, in 2005. And then—yes, 2005. If there's nothing further, I will yield to the court. Thank you. We thank both sides, and the case is submitted. That concludes our proceedings for this morning. All rise.